Filed 7/3/2012 (see Reporter's Note below)

<strong>PARTIAL PUBLICATION ORDERED BY SUPREME COURT*</strong>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| 420 CAREGIVERS, LLC et al., | B230436 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC433942) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Anthony J. Mohr, Judge. Reversed.

Carmen A. Trutanich, City Attorney, Jane E. Usher, Assistant City Attorney, Steven Blau, Colleen M. Courtney and Charles D. Sewell, Deputy City Attorneys, for Defendant and Appellant.

Best Best & Krieger, Jeffrey V. Dunn and Lee Ann Meyer for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Appellant.

_____

* Reporter's Note: This opinion, filed for publication July 3, 2012, and modified July 19, 2012, was granted review September 19, 2012, S024684. On July 31, 2013, review was dismissed and the cause remanded. On September 25, 2013, the Supreme Court ordered partial publication of the Court of Appeal's opinion as modified (the modification is incorporated herein). Part III of the "Discussion," originally published by the Court of Appeal, is consistent with, but has since been superseded by, *City of Riverside v. Inland Empire Patients Health and Wellness Center, Inc.* (2013) 56 Cal.4th 729. To avoid confusion, part III has therefore not been ordered republished by the Supreme Court. "The Supreme Court may . . . order publication of an opinion, in whole or in part, at any time after granting review." (Cal. Rules of Court, rule 8.1105(e)(2).)

D|R Welch Attorneys at Law, David R. Welch; Norris & Galanter and Douglas F. Galanter for Plaintiffs and Respondents 420 Caregivers, LLC, 420 Collective, 420 Highway Pharmacy Inc., American Sobriety Inc., Buddha Bar Collective, Compassionate Caregivers of San Pedro, Exclusive Caregivers of California Inc., Galaxy Caregivers Group LLC, Green Joy Inc., Green Leaf Collective, Healers on 3rd Inc., Herbal Medicine Care Inc., Herbal Remedies Caregivers Inc., The Hills Caregivers, Holistic Cannabis Collective, JEG Inc., Wilshire Medical Marijuana Collective, Medical Wellness Center Inc., Medical Marijuana Collective, Natural Ways Always, Nature's Wonder Caregivers Group Inc., The Shop at Greenbush, Starbudz, Stargate Collective Medical Marijuana & Collective, Sunset Junction Organic Medicine Medical Marijuana Collective, Trinity Holistic Caregivers Inc., Valley Hollistic Caregivers Inc., 818 NPO, A-1 Organic Collective, AKH LLC, Always 420, American Eagle Collective II, BB Collective Inc., Buds on Melrose, California Organic Collective, Green Horizon Collective, Green Secret Garden, Herbal Health Resource Center, House of Kush, HTA Happenings, Le Peu, Love & Spirit Care Center Inc., Organic Healing Center Inc., Sunland Organic Pharmacy, Sunny Day Collective, NPO, Liberty Bell Temple II Inc., Helping Hint Caregivers, Herbal Love Caregivers on the Boulevard, Hollywood's Compassionate Caregivers, Infinity Philanthropy Global, LAHC 3 Collective, Pacoima Recovery Collective Inc., Royal Herb Merchant, T.L.P.C., Traditional Herbal Center Inc. Collective Caregivers, Universal Caregivers Inc., West Valley Caregivers, Westwood Organics, Metal Horns, Inc., Los Angeles Community Collective, Better Alternative Treatment, Montana Caregivers Inc., G Art Gallery Collective Inc., Venice Alternative Healing Collective, Van Nuys Health Clinic, Private Organic Therapy, Advanced Pain Solutions, Herbal Medicine for You, Inc., Green Magic Collective, Best Quality Herbal Medicine, Inc., HCC - Herbal Compassionate Caregiver, Inc., and Green Dot Medicinal Cannabis Patients Group.

Law Offices of Stanley H. Kimmel, Stanley H. Kimmel and Alison Minet Adams for Plaintiffs and Respondents Melrose Quality Pain Relief, Inc., Abdul Ahmed, Robina Bashir, Herbalology Inc., Sean Cardillo, Safe Life Caregivers, Josean Posey, New Era Caregivers, Maz Gilardian, Kush Korner V, Inc., Peter Pietrangelia, God's Gift, Andrew Kang, Downtown Natural Caregivers, Yun Kang, The Meds Merchant, Inc., South Bay Wellness Network, Relief Corp Inc., Healthy Herbal Care, Inc., and Herbal Nutrition Inc.

Kumin Sommers, Matthew W. Kumin, Ramsey Hanafi; and Alison Minet Adams for Plaintiffs and Respondents Kevin Anderson, Laron J. Clarke III, Earl Stein, Sandra Mallut, Rafael Carrera Oliva, Dennis Nichols, Donna Henderson, Carlos Cisneros, Kimberly Tornero, Michael Helfin, Shirley Eberle and John Conroy.

* * * * * * *

Appellant in this case is the City of Los Angeles (City). Respondents are various collectives and individual members of collectives (Collectives) currently engaged in the cultivation, distribution, or use of medical marijuana within City limits.[1] In the court below, the Collectives filed various separate lawsuits seeking to enjoin enforcement of City Ordinance No. 181069 (Ordinance), passed by the City Council on January 26, 2010, and approved by the Mayor on February 3, 2010. The Ordinance regulates the number and geographic distribution of medical marijuana collectives within City limits. It also imposes a number of other regulations on the operation of medical marijuana collectives within City limits.

---

[1] The City filed both opening and reply briefs. Three respondents' briefs were filed: one on behalf of numerous collectives, the lead collective being 420 Caregivers, LLC (420 Caregivers et al.); one on behalf of numerous collectives, the lead collective being Melrose Quality Pain Relief, Inc. (Melrose et al.); and one on behalf of numerous individual members of collectives, the lead individual being Kevin Anderson (Anderson et al.). The League of California Cities and the California State Association of Counties requested permission to file a joint amici curiae brief in support of the City. We previously granted leave to file the amici brief. Melrose et al. filed a response to the amici brief. We have reviewed and considered all of the above-mentioned briefs in reaching this decision.

The trial court consolidated the various separate lawsuits and, after multiple hearings, preliminarily enjoined enforcement of portions of the Ordinance on the following grounds: (1) violation of the federal right to equal protection; (2) preemption by state law; (3) violation of the state right to due process; and (4) violation of the state right to privacy. The City now appeals from the trial court's preliminary injunction.

For the reasons that follow, and based upon considerable guidance received from cases decided and a statute enacted after the trial court rendered its decision, we reverse the trial court's order granting the request for a preliminary injunction. We remand this case for further proceedings consistent with this opinion.

## STATUTORY AND PROCEDURAL BACKGROUND

Both the trial court's order and the issues raised in this appeal involve the interplay of various state and local laws, enacted at different times since 1996. Accordingly, a lengthy statutory and procedural background follows.

### 1. The Compassionate Use Act

In 1996, California voters approved Proposition 215, known as the Compassionate Use Act (CUA), which is codified in Health and Safety Code section 11362.5. The CUA provides that no physician shall be punished, or denied any right or privilege, for having recommended marijuana to a patient for medical purposes. (§ 11362.5, subd. (c).) The CUA also immunizes specific persons from specific prosecutions under the Health and Safety Code:

> "[Health and Safety Code] [s]ection 11357, relating to the possession of marijuana, and [s]ection 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." (§ 11362.5, subd. (d).)

The CUA defines "primary caregiver" as the person designated by the patient "who has consistently assumed responsibility for the [patient's] housing, health, or safety." (Health & Saf. Code, § 11362.5, subd. (e).)

4

Significantly, for purposes of this case, the CUA also provides that "[n]othing in this section shall be construed to supersede legislation prohibiting persons from engaging in conduct that endangers others, nor to condone the diversion of marijuana for nonmedical purposes." (Health & Saf. Code, § 11362.5, subd. (b)(2).) It also expressly "encourage[s] the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana." (§ 11362.5, subd. (b)(1)(C).)

## 2. The Medical Marijuana Program Act

In 2003, the California Legislature enacted the Medical Marijuana Program Act (MMPA), codified in Health and Safety Code sections 11362.7 through 11362.83. The MMPA was passed, in part, to clarify the scope of the CUA and promote its uniform application "among the counties within the state." (Stats. 2003, ch. 875, § 1.)

To accomplish these goals, the MMPA empowers the Department of Health Services to create a voluntary program for the issuance of identification cards to "qualified patients." (Health & Saf. Code, § 11362.71, subd. (a)(1).) "Qualified patients" are defined as those persons "entitled to the protections" of the CUA. (§ 11362.7, subd. (f).)

The MMPA then grants immunity from prosecution to an expanded list of offenses so long as the underlying conduct involves medical marijuana use:

> "Subject to the requirements of this article, the individuals specified in subdivision (b) shall not be subject, *on that sole basis*, to criminal liability under [Health and Safety Code] [s]ection[s] 11357 [possession], 11358 [cultivation], 11359 [possession for sale], 11360 [sales], 11366 [maintaining a place], 11366.5 [providing a place], or 11570 [nuisance]." (§ 11362.765, subd. (a), italics added.)

The individuals to whom this immunity applies are expanded beyond the patients and primary caregivers protected by the predecessor CUA: the MMPA grants immunity to (1) qualified patients, persons with identification cards, and the primary caregivers of such persons; (2) individuals who provide assistance to persons in these three groups in administering medical marijuana; and (3) individuals who provide assistance to persons

in these three groups in acquiring the skills necessary to cultivate or administer medical marijuana. (Health & Saf. Code, § 11362.765, subd. (b).)

Significantly, the MMPA also expressly extends immunity to the same enumerated Health and Safety Code sections for additional, "collective," conduct:

> "Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who *associate* within the State of California in order *collectively or cooperatively* to cultivate marijuana for medical purposes, shall not *solely on the basis* of that fact be subject to state criminal sanctions under [s]ection[s] 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570 [of the Health and Safety Code]." (§ 11362.775, italics added.)

The MMPA, as originally enacted, also affirmatively provided that "[n]othing in this article shall prevent a city or other local governing body from adopting and enforcing laws consistent with this article." (Stats. 2003, ch. 875, § 2 [Health & Saf. Code, former § 11362.83].) More importantly, during the pendency of this appeal, that section was amended to read, in full:

> "Nothing in this article shall prevent a city or other local governing body from adopting and enforcing any of the following: [¶] (a) Adopting local ordinances that regulate the location, operation, or establishment of a medical marijuana cooperative or collective. [¶] (b) *The civil and criminal enforcement of local ordinances described in subdivision* (*a*). [¶] (c) Enacting other laws consistent with this article." (Health & Saf. Code, § 11362.83, italics added.)

### 3. The City's Interim Control Ordinance

In response to citizen complaints and law enforcement concerns about the proliferation of storefront medical marijuana dispensaries within City limits, the City Council passed Interim Control Ordinance No. 179027 (ICO) on August 1, 2007, and the Mayor approved it on August 10, 2007. The ICO went into effect September 14, 2007.[2]

---

[2] The court below and the parties seem to agree, either expressly or impliedly, that the ICO became effective September 14, 2007. No one, though, expressly articulates how this date was determined. This court's own research discloses the following. Los Angeles City Charter, article II, section 250, subdivisions (b) and (c) require mayoral approval of ordinances passed by the City Council or, where the Mayor vetoes, an override of that veto by the City Council. Section 251 requires an ordinance "finally

For a period of one year from its effective date or until adoption of a permanent ordinance, whichever came first, the ICO prohibited the establishment or operation of a medical marijuana *dispensary* within the City limits.  The ICO defined a medical marijuana dispensary as any facility or location that "distributes, transmits, gives, dispenses, facilitates, or otherwise provides marijuana in any manner in accordance with [s]tate law, in particular, California Health and Safety Code [s]ections 11362.5 through 11362.83 [the CUA and the MMPA], inclusive."  The ICO, however, also created one large exception to the general prohibition of dispensaries:  any dispensary established before September 14, 2007 (the effective date of the ICO) and operated in accordance with state law would be allowed to continue so long as it filed various specified documents with the City Clerk within 60 days of "the adoption" of the ICO.[3]  The parties, as well as the court below, seem to agree that the 60th day was November 13, 2007.[4]

_____

adopted under the provisions of the Charter" to be published either once in a daily newspaper circulated in the City or as otherwise authorized by the ordinance.  Finally, section 252 provides that nonurgency ordinances take effect 31 days after their publication.  At oral argument, the City provided the citation to the appendix on appeal which shows that the ICO was published on August 14, 2007.  September 14, 2007, was the 31st day after publication and thus the effective date of the ICO.

[3]    The ICO identifies the required documents as (1) a form to be designated by the City Clerk, (2) a City tax registration certificate, (3) a state Board of Equalization seller's permit, (4) the property lease, (5) proof of business insurance, (6) dispensary membership forms, and, if required, (7) a county health permit.

[4]    The ICO expressly states that dispensaries in operation before its "effective" date are exempt so long as they file the requisite paperwork within 60 days of its "adoption."  A literal interpretation of this language would suggest that dispensaries in existence prior to September 14, the effective date of the statute, would be exempt so long as they filed the requisite paperwork within 60 days of either August 1, the day the City Council passed the ICO, or August 10, the day the Mayor approved it, whichever event legally constitutes its "adoption."  This literal interpretation of the ICO's language, though, would mean the 60-day period for registration began before the statute was ever published, and therefore before it was legally effective, which is an unreasonable construction.  Following generally accepted rules of statutory construction, this court finds that the City Council intended the registration period to begin the date the ICO became effective and inadvertently chose imprecise language.  (See *People v. Mendoza*

7

The ICO also allowed up to two 180-day extensions of its prohibition so long as the City Council found that the various agencies responsible for investigation relevant to a permanent ordinance were exercising due diligence. Subsequently, the City Council enacted both of the available 180-day extensions. On June 19, 2009, the City Council passed an entirely new ordinance, Interim Control Ordinance No. 180749, which amended the ICO and extended its prohibitions to March 15, 2010, or the enactment of a permanent ordinance, whichever came first.

Approximately 187 "dispensaries" registered on or before November 13, 2007, pursuant to the ICO. Over 30 of these "dispensaries" expressly identified themselves in their names as either a medical marijuana "collective" or "cooperative." Over 30 more expressly utilized the plural term "caregivers" in their names, implicitly suggesting collective associations of primary caregivers.

### 4. The City's Permanent Ordinance

On January 26, 2010, the City Council passed the Ordinance, which added article 5.1 (§ 45.19.6 et seq.) to chapter IV of the Los Angeles Municipal Code.[5] The Mayor approved the Ordinance on February 3, 2010. The Ordinance went into effect June 7, 2010, after approval of a final fee schedule.[6]

Prior to enactment of the Ordinance, the City Council and City Planning and Land Use Management Committee (Planning Committee) conducted at least 16 public hearings

(2000) 23 Cal.4th 896, 908 [courts should avoid statutory construction that would produce "absurd consequences" not intended by the Legislature].)

[5]     All undesignated section references are to the Ordinance as passed by the Council on January 26, 2010, unless otherwise noted. Such references do not include any subsequent amendments to the Ordinance.

[6]     Both the City and 420 Caregivers et al. seem to agree that June 7, 2010, was the effective date of the Ordinance, and the trial court so found. Again, however, the parties do not articulate how that June 7 date was determined. Based upon the reasoning and authorities discussed above in footnote 2, *ante*, a June 7 effective date seems consistent with the date the final fee ordinance was approved by the Mayor, assuming the required publication of that ordinance occurred within reasonable due course. Accordingly, we uphold the trial court's finding of June 7, 2010, as the effective date of the Ordinance.

8

regarding the community impact of entities engaged in the distribution of medical marijuana. The hearings involved testimony from members of the public, including medical marijuana patients, the owners and operators of entities engaged in the cultivation and distribution of medical marijuana, and residents living near these entities. These hearings also included testimony from high-ranking members of the Los Angeles Police Department. Evidence presented to the City Council and the Planning Committee showed both an explosive increase in the number of entities dispensing medical marijuana and a significant increase in crime and citizen complaints involving those entities. It also showed that some of these entities were diverting marijuana to uses not authorized by the CUA or MMPA. Finally, it showed that scarce law enforcement resources were often diverted to criminal investigations involving these entities.

As a result, the City Council enacted the Ordinance for the express purpose of protecting the health, safety, and welfare of the City residents by regulating the collective cultivation of medical marijuana inside City limits. (§ 45.19.6.) To achieve this goal, the Ordinance requires all "medical marijuana *collectives*" to comply with its provisions. (*Ibid.*, italics added.) It defines "medical marijuana collectives" as incorporated or unincorporated associations of four or more qualified patients, persons with identification cards, or primary caregivers, who collectively or cooperatively associate at a given location to cultivate medical marijuana in accordance with the CUA and MMPA. (§ 45.19.6.1(B).)

The Ordinance requires all medical marijuana collectives to submit to a new registration and approval process to continue operation. (§ 45.19.6.2(A).) Subject to an exception discussed below, the Ordinance caps the total number of allowable collectives at 70, to be distributed proportionally around the City's various neighborhoods according to population densities as mapped by the Planning Committee. (§ 45.19.6.2(B)(1).)

Initially, the only collectives eligible to register under the Ordinance are those that (1) previously registered on or before November 13, 2007, in compliance with the ICO; (2) have operated continuously at their registered location since on or before September 14, 2007 (the effective date of the ICO), or both moved once in response to a

9

federal enforcement letter and sought a hardship exemption under the ICO; (3) continue to have the same ownership and management as that identified in their City registration documents; (4) have not been cited for nuisance or public safety violations of state or local law; and (5) are currently at or designate a new location that meets new Ordinance requirements regarding distances from other collectives, schools, parks, libraries, and other specified sensitive uses.  (§§ 45.19.6.2(B)(2), 45.19.6.3(A)(2).)  To the extent the total number of initially eligible collectives exceeds 70, they nevertheless remain eligible and are to be allocated proportionally throughout the City based upon the population densities in the various neighborhoods as determined by the Planning Committee. (§ 45.19.6.2(B)(2).)  All potentially eligible collectives were to notify the City of their intent to register at a designated location within one week of the Ordinance's effective date.  (§ 45.19.6.2(C)(1).)  The City decided to give priority to collectives that had registered under the ICO because they had already shown a willingness to be openly compliant with and regulated by the law.

The Ordinance requires all other collectives to cease operation immediately. (§ 45.19.6.7.)  It does, however, allow other collectives not currently eligible to register to participate in a future lottery for the opportunity to register should the total number of operating collectives ever fall below 70.  (§ 45.19.6.2(C)(2).)  The Ordinance sunsets after two years unless extended by the City Council and, if not extended, all collectives must cease operation.  (§ 45.19.6.10.)  Violations of the Ordinance are punishable as misdemeanors.  The Ordinance may also be enforced through nuisance abatement proceedings.  (§ 45.19.6.9; L.A. Mun. Code, § 11.00, subd. (m).)

Collectives that register with and ultimately obtain permission to operate from the City pursuant to the Ordinance must maintain certain records:  (1) the names, addresses, and phone numbers of all members engaged in management of the collective; (2) the names, addresses and phone numbers of all patient members to whom the collective provides marijuana; (3) copies of the patient members' MMPA identification cards or doctors' recommendations; (4) the names, addresses, and phone numbers of all primary caregiver members to whom the collective provides marijuana; and (5) copies of the

10

primary caregivers' MMPA identification cards or their qualified patients' written designations. (§ 45.19.6.4.) The collective must maintain these records for five years and must make them available to the Los Angeles Police Department upon demand. (*Ibid*.)

The above notwithstanding, the Ordinance expressly states that "private medical records" may not be obtained by the police absent an otherwise valid warrant, court order, or subpoena. (§ 45.19.6.4.) The Ordinance defines a "private medical record" as documentation of the qualified patient's or identification card holder's medical history other than a physician's recommendation, the actual MMPA identification card, or the written designation of a primary caregiver by a qualified patient or identification card holder. (§ 45.19.6.1(B).)

Collectives not eligible under the Ordinance because they had not previously registered under the ICO were sent letters by the City Attorney advising them that they were or would be in violation of the Ordinance and that continued operation might result in criminal prosecution.

### 5. The Trial Court's Injunction

Beginning in March 2010, the Collectives began filing lawsuits seeking to enjoin enforcement of the Ordinance. The multiple lawsuits were eventually consolidated before one trial court. On December 10, 2010, after extensive hearings, the trial court preliminarily enjoined enforcement of portions of the Ordinance.

The trial court based its injunction on a number of legal conclusions: (1) the Ordinance violates federal equal protection because it requires eligible collectives to have previously registered under the ICO, which, despite its terms, expired by operation of law nearly 60 days before the end of the registration period; (2) the Ordinance's sunset and penal provisions are preempted by the MMPA; (3) the Ordinance violates state procedural due process because it requires collectives that did not register under the ICO to cease operation immediately without the benefit of a hearing; and (4) the Ordinance's record-keeping and record disclosure requirements violate the state right to privacy.

11

## 6. Litigation and Legislation Since the Injunction

On January 10, 2011, the trial court required the Collectives to post a bond in the amount of $348,102 pursuant to Code of Civil Procedure section 529. On January 13, 2011, the court requested additional briefing on the bond issue and stayed the injunction pending resolution of the bond issue. To date, the bond issue has not been resolved and the trial court's stay of the injunction remains in effect.

On January 21, 2011, the City Council passed Temporary Urgency Ordinance No. 181530 (TUO) and the Mayor approved it on January 25, 2011. The TUO amends the Ordinance, purportedly to resolve the defects in it as found by the trial court. By its terms, it remains in effect only until the preliminary injunction is reversed on appeal or permanent amendments to the Ordinance are enacted.[7]

## DISCUSSION

## I. Review of Preliminary Injunction: Applicable Legal Standards

When deciding whether to issue a preliminary injunction, a trial court weighs two interrelated factors: (1) the likelihood the moving party will prevail on the merits and (2) the relative interim harm to the parties from issuing or not issuing the injunction. (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 999.)

On appeal, factual findings made by the trial court must be accepted if supported by substantial evidence. (*County of Los Angeles v. Hill* (2011) 192 Cal.App.4th 861, 867 (*Hill*).) Ordinarily, the decision to issue a preliminary injunction is reviewed for an abuse of discretion. (*City of Corona v. Naulls* (2008) 166 Cal.App.4th 418, 427.) Whether a local ordinance is unconstitutional or preempted, however, is a question of law subject to de novo review. (*Hill*, *supra*, at p. 867; *City of Claremont v. Kruse* (2009) 177 Cal.App.4th 1153, 1168 (*Kruse*); see also *Arcadia Development Co. v. City of Morgan*

---

[7] In their respondents' brief, Melrose et al. argue that the bond-related stay and the enactment of the TUO render the City's appeal moot and/or premature, and for that reason the appeal should be dismissed. These issues were already resolved by this court's denial of Melrose's separate motion to dismiss the appeal and will not be addressed again in this opinion.

12

*Hill* (2011) 197 Cal.App.4th 1526, 1534 (*Arcadia Development*) [where pertinent facts are not in dispute, appellate review is de novo].)

## II. Equal Protection

### A. The Trial Court's Opinion

As stated above, to be eligible to register under the Ordinance, a collective must have previously registered under the ICO on or before November 13, 2007. To be eligible to register under the ICO, a collective must have been in existence prior to September 14, 2007, the effective date of the ICO. In the court below, the City argued that prior registration under the ICO is a reasonable way to determine preference: past compliance with the ICO shows a willingness to follow the law, which in turn is a good predictor of law-abiding behavior going forward.

The trial court disagreed. It found the Ordinance's requirement of previous registration under the ICO to be arbitrary. The trial court concluded, therefore, that the Ordinance violates equal protection.

The trial court reasoned as follows. The City Council passed the ICO on August 1, 2007. The ICO, despite its express initial term of one year, expired by operation of law 45 days later on September 15, 2007. To reach this finding, the trial court relied upon Government Code section 65858, subdivision (a), which provides that local interim zoning ordinances, such as the ICO, automatically expire 45 days after their "adoption," unless extended after a noticed public hearing. Since no such noticed public hearing occurred in this case, the trial court concluded that the ICO necessarily expired on September 15, 2007, one day after its effective date of September 14, 2007, and only one day into the 60-day registration period which it authorized.

The trial court then opined – hypothetically – that an otherwise law-abiding collective able to register under the express terms of the ICO, might have declined to do so because of its belief that the ICO expired as of September 15, 2007. A failure to register under the ICO, then, was not necessarily a refusal to follow the law, but possibly only a recognition that the law was no longer valid. Thus, the trial court reasoned, a collective's failure to register under the ICO did not necessarily mean that it was less

13

likely to follow the law in the future. Accordingly, the trial court concluded, the requirement violated federal principles of equal protection.

Before we evaluate the trial court's ruling, it is important to frame properly the issues before this court. The relevant issue is not the constitutionality or even the nonconstitutional legality of the ICO per se. The issue is the constitutionality of the Ordinance insofar as it requires prior compliance with the ICO.

Second, the trial court did *not* find the Ordinance unconstitutional *as applied*: it did not find – and apparently no evidence was presented – that any particular collective prohibited from registering under the Ordinance because of noncompliance with the ICO was in fact eligible to register under the ICO but chose not to for any reason, let alone out of a belief that the ICO had already expired. The trial court based its decision entirely on the hypothetical existence of a collective or group of collectives that could have registered under the express terms of the ICO but chose not to because of a belief that the ICO had already expired by operation of law. Thus, although it did not expressly so state, the trial court's ruling that the Ordinance violates equal protection is necessarily a ruling *on the face* of the Ordinance and not on the Ordinance as applied.

In their briefs to this court, the Collectives likewise do not contend that any of them actually fit within this category theorized by the trial court. Thus, the equal protection challenge to the Ordinance remains facial rather than as applied.[8]

---

[8]  At oral argument, the City and 420 Caregivers et al. agreed that the equal protection challenge is to the face of the Ordinance. Melrose, on its own behalf, argued that its challenge is both facial and as applied since the City had closed it due to noncompliance with the Ordinance. At oral argument, Melrose cited to its July 26, 2010 ex parte application for a temporary restraining order, which the trial court ultimately denied, as providing a factual basis for its as applied challenge. We have reviewed the application and supporting declarations, as well as the City's opposition and supporting declarations. The application, opposition, and various declarations describe a July 20, 2010 police undercover marijuana purchase and subsequent search warrant execution at Melrose's place of business. Pursuant to the warrant, officers seized small amounts of marijuana and cash. The officers also cited those at the location to appear in court, based upon an alleged violation of the Ordinance. Notwithstanding this citation for an Ordinance violation, a review of the record cited above shows that the investigation was based on facts which led the Los Angeles Police Department to believe that Melrose was

14

## B. Applicable Law

With the issues thus framed, we review the applicable law. Equal protection under the law means that parties similarly situated with respect to a law must be treated alike under the law. (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 857 (*Las Lomas*); see U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).) That does not mean, however, that differential treatment is always unconstitutional. Where a statute makes distinctions involving inherently suspect classifications or fundamental rights, it is subject to "strict scrutiny" and may be upheld only if the *government* establishes the distinction is necessary to achieve a compelling state interest. (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 480 (*Kasler*).) Most legislation, however, is reviewed only to determine whether the challenged classification bears a rational relationship to a legitimate state interest. (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1200 (*Hofsheier*).) In areas of social or economic policy not involving suspect classifications or fundamental rights, a statute must be upheld so long as there is any reasonably conceivable set of facts that provides a "rational basis" for the classification. (*FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 313 (*FCC*); accord, *Las Lomas*, *supra*, at p. 858.)

Moreover, in those cases *not* involving suspect classifications or fundamental rights, it is the *party challenging the statute* who must demonstrate that the difference in treatment is unrelated to the achievement of any legitimate government purpose. (*Kasler, supra*, 23 Cal.4th at p. 480.) This means that the challenging party must essentially negate every conceivable legitimate basis which might support the statutory classification. (*FCC*, *supra*, 508 U.S. at p. 315.) Because a legislative body is not required to articulate its reasons for enacting a statute, whether the conceived reason

---

distributing marijuana not to collective members, but to third parties for cash. Such conduct, if true, is a felony violation of the Health and Safety Code not subject to the immunity provisions of either the CUA or the MMPA. In any event, the incident and conduct described above do not establish, as a factual matter, that Melrose could have registered under the ICO but chose not to because of a belief that the ICO had expired. It therefore does not make its equal protection claim an as applied challenge.

supporting the statute actually motivated the legislative body is entirely irrelevant for constitutional purposes. (*Ibid.*; *Hofsheier*, *supra*, 37 Cal.4th at p. 1201.) "In other words, a legislative choice is not subject to courtroom factfinding [*sic*] and may be based on rational speculation unsupported by evidence or empirical data." (*FCC*, *supra*, at p. 315.) Under the rational basis test, a strong presumption favors the validity of the challenged statute. (*Id.* at p. 314; see *Kasler*, *supra*, at p. 480.)

The United States Supreme Court has articulated why such deference is paid to statutes which do not affect suspect classifications or fundamental rights:

> "This standard of review is a paradigm of judicial restraint. 'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.' [Citation.]" (*FCC*, *supra*, 508 U.S. at p. 314; see also *Las Lomas*, *supra*, 177 Cal.App.4th at p. 858.)

When evaluating a facial constitutional challenge, the court considers only the text of the statute itself, not its application to the particular circumstances of an individual party. (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.) The California Supreme Court has not articulated a single standard for determining the validity of a facial challenge. (*Zuckerman v. State Bd. of Chiropractic Examiners* (2002) 29 Cal.4th 32, 39 (*Zuckerman*); *Coffman Specialties, Inc. v. Department of Transportation* (2009) 176 Cal.App.4th 1135, 1145 (*Coffman*).) Under the more strict test, the party challenging the statute must establish that it "'inevitably pose[s] a present total and fatal conflict with applicable constitutional prohibitions.' [Citation.]" (*Guardianship of Ann. S.* (2009) 45 Cal.4th 1110, 1126; accord, *Coffman*, *supra*, at p. 1145.) Under the more lenient test, the challenging party must establish that the statute is unconstitutional "'in the generality or great majority of cases.' [Citations.]" (*Guardianship of Ann S.*, *supra*, at p. 1126, italics omitted; accord, *Coffman*, *supra*, at p. 1145; see also *Arcadia Development, supra*, 197 Cal.App.4th at p. 1535 [challenging party must show the statute unconstitutional "in all or most cases"].) Under either test, the challenging party bears a heavy burden and "'"cannot prevail by suggesting that in some future hypothetical situation constitutional

16

problems may possibly arise as to the particular *application* of the statute.”’  [Citation.]”
(*Coffman*, *supra*, at p. 1145; accord, *Arcadia Development*, *supra*, at p. 1535; see also
*Zuckerman*, *supra*, at p. 39.)

We need not decide which test articulated by the Supreme Court is applicable in
this case.  Since we find, as will be discussed below, that the Collectives have not met
their burden even under the more lenient standard, we need not discuss application of the
stricter test.  (See *Guardianship of Ann S.*, *supra*, 45 Cal.4th at p. 1126.)

### C.  Legal Analysis

The Ordinance makes distinctions involving neither fundamental rights nor
suspect classifications.  It therefore must be analyzed under the rational basis test
described above.

Insofar as it incorporates the requirement of prior registration under the ICO, the
Ordinance essentially prohibits collectives that began operating on or after September 14,
2007, since they could not have registered pursuant to the ICO.  It essentially allows
those collectives in existence prior to September 14, 2007, so long as they also completed
formal registration under the ICO.  As such, the Ordinance is essentially a “grandfather
provision” with the added gloss of a prior registration requirement.  So-called
“grandfather provisions” have routinely withstood equal protection challenges, both at
the federal and state levels.

In *New Orleans v. Dukes* (1976) 427 U.S. 297 (*Dukes*), the City of New Orleans
banned all pushcart food vendors from the French Quarter who had not been operating
for at least eight years prior to January 1, 1972.  (*Id.* at p. 298.)  Dukes, who had operated
within the French Quarter for only two years prior to the cut-off date, challenged the
ordinance on equal protection grounds.  (*Id*. at pp. 298-299.)  The trial court granted the
city’s motion for summary judgment.  The appellate court reversed.  (*Id*. at p. 299.)

The Supreme Court reversed the decision of the appellate court and upheld the
ordinance.  The Court first observed that in the area of local economic regulation which
does not implicate fundamental rights or suspect classifications, the courts do “not sit as a
superlegislature [*sic*] to judge the wisdom or desirability of legislative policy

17

determinations[.]" (*Dukes, supra,* 427 U.S. at p. 303.) In such areas of local concern, the Court noted, "it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with [principles of equal protection]." (*Id.* at pp. 303-304.)

The Court went on to find that the ordinance's classification furthered the city's purpose of preserving the historic ambience of the French Quarter and encouraging the tourist economy. The city council could reasonably conclude that "street peddlers and hawkers" interfered with the charm of the French Quarter and thus might discourage tourism if not "substantially curtailed" or "totally banned." (*Dukes, supra,* 427 U.S. at pp. 304-305.) The use of a "grandfather provision," banning some vendors but allowing others, was neither irrational nor arbitrary:

> "But rather than proceeding by the immediate and absolute abolition of all pushcart food vendors, the city could rationally choose initially to eliminate vendors of more recent vintage. This gradual approach to the problem is not constitutionally impermissible. The governing constitutional principle was stated in *Katzenbach v. Morgan* [(1966) 384 U.S. 641, 657]:

> > '[W]e are guided by the familiar principles that a "statute is not invalid under the Constitution because it might have gone further than it did," [citation], that a legislature need not "strike at all evils at the same time," [citation], and that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," [citation].'

> "The city could reasonably decide that newer businesses were less likely to have built up substantial reliance interests in continued operation in the [French Quarter] and that the two vendors who qualified under the 'grandfather clause' – both of whom had operated in the area for over 20 years rather than only eight – had themselves become part of that distinctive character and charm that distinguishes the [French Quarter]. We cannot say that these judgments so lack rationality that they constitute a constitutionally impermissible denial of equal protection." (*Dukes, supra,* 427 U.S. at p. 305.)

Similarly, in *Martinet v. Department of Fish & Game* (1988) 203 Cal.App.3d 791, 794 (*Martinet*), the Court of Appeal rejected an equal protection challenge to a state law that limited the number of shark and swordfish permits issued to new applicants but did not limit the number issued to prior permittees, so long as the prior permittees also

18

fulfilled other conditions not pertinent here. In its decision, the court summarized the controlling law:

> "An economic regulation creating classifications with some reasonable basis does not result in denial of equal protection simply because the classifications are mathematically imprecise or because their application results in some inequality. [Citation.] A law which favors existing businesses over new ones will be upheld if there is any reasonable and substantial justification for the distinction. [Citation.] The person challenging such a classification has the burden of proving it is arbitrary and without reasonable foundation. [Citation.] '[I]f any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed.' [Citation.]" (*Martinet, supra,* 203 Cal.App.3d at p. 794.)

Applying that law to the facts before it, the court further found a rational basis for the legislation at issue:

> "The members of this class of prior permittees . . . may reasonably be assumed to rely on the limited fishery for their livelihood. The possibility this differentiation may not be exact does not render the statutes unconstitutional. Nor may Martinet successfully claim the statutes are invalid because they protect shark and swordfish from overfishing by new entrants but not prior permittees. The Legislature may adopt economic regulations 'that only partially ameliorate a perceived evil.' [Citation.] The statutes are reasonably drawn to protect against overfishing, while also protecting the fishing industry and those persons who have invested in and practiced drift gill net fishing of shark and swordfish in the past[.]" (*Martinet*, *supra*, 203 Cal.App.3d at p. 795, quoting *Dukes*, *supra*, 427 U.S. at p. 303.)

It is clear, based on the authorities discussed above, that had the Ordinance simply chosen September 14, 2007 as the date prior to which collectives eligible under the Ordinance had to exist, the statute would have passed constitutional muster. The City, as of the date it passed the Ordinance, would have been able to articulate a rational relationship between the classification and a legitimate government interest: (1) the proliferation of crime associated with the increased number of medical marijuana collectives, coupled with the police department's limited resources, require that the number of collectives be restricted and their operations regulated; (2) those collectives in existence prior to September 14, 2007, and who have continued to operate from that time

19

in a lawful manner have over a two-year track record that is a valid predictor of law-abiding behavior going forward; and (3) they should therefore be given preference over post-September 14 collectives.

The trial court found the cases above inapplicable because rather than simply set September 14, 2007 as the date prior to which an eligible collective had to exist, the Ordinance instead required registration under the ICO. This registration requirement established September 14, 2007 as the de facto cut-off date, but the ICO's lapse, as found by the trial court, created a potential class of collectives whose failure to register theoretically did not indicate an unwillingness to follow the law.[9]

The hypothetical possibility that some excluded collectives refused to register based not on an inclination towards lawlessness but on a belief that the law had expired, although theoretically "unfair" to some, does not violate equal protection. It bears repeating that "[a]n economic regulation creating classifications with some reasonable basis does not result in denial of equal protection simply because the classifications are mathematically imprecise or because their application results in some inequality." (*Martinet*, *supra*, 203 Cal.App.3d at p. 794; see *Dukes*, *supra*, 427 U.S. at pp. 303, 306.) Whether or not it expired before its stated term because of Government Code section 65858, the ICO was a facially valid local ordinance, duly enacted by a legitimate legislative body with authority generally to legislate in the area. Approximately 187 medical marijuana entities, over 60 of which expressly or implicitly by their names

---

[9] In its equal protection argument, the City points out that it is a charter city and argues that the ICO did not lapse because Government Code section 65858, subdivision (a), does not apply to a charter city. The City alternatively argues that even if section 65858 applies, section 65010, subdivision (b), saves the ICO because (1) the City's failure to properly set or extend the term of the ICO was a procedural error only and (2) section 65010 requires a plaintiff to establish prejudice before invalidating a local ordinance based upon procedural errors. The Collectives counter by arguing that the City waived its charter city argument because it did not raise it below. Alternatively, the Collectives contend that section 65858 does apply to charter cities when enacting zoning ordinances such as the ICO and that section 65010 cannot save the ICO because the error was substantive, not procedural. We do not reach these arguments involving the interplay between local zoning ordinances and the Government Code because, based upon the analysis above, it is not necessary to do so.

alone indicated they were collective associations, chose to comply with the ICO and register, pursuant to its express terms, on or before November 13, 2007. Their willingness to follow this duly enacted ordinance, whatever its ultimate legality as subsequently determined in a court of law, provided the City with a rational basis to conclude that they would continue to act in a law-abiding manner going forward. That a theoretical class of collectives excluded under the Ordinance might similarly act in a law-abiding fashion, though perhaps "unfair" on some level, does not violate equal protection:

> "Defining the class of persons subject to a regulatory requirement – much like classifying government beneficiaries – 'inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.' [Citation.]" (*FCC*, *supra*, 508 U.S. at pp. 315-316; accord, *Warden v. State Bar* (1999) 21 Cal.4th 628, 645.)

Moreover, even if the unfairness to this theoretical class of collectives arguably implicates equal protection, the Collectives still have not demonstrated an equal protection violation. The Ordinance's requirement of prior registration under the ICO essentially differentiates medical marijuana collectives into three separate groups: (1) those in existence *prior* to September 14, 2007, who were therefore *eligible* to register under the ICO and *who did so* on or before November 13, 2007; (2) those in existence *prior* to September 14, 2007, who were therefore *eligible* to register under the ICO but *who chose not to*; and (3) those in existence *on or after* September 14, 2007, who were therefore *ineligible* to register under the ICO. The members of group 1 are eligible to register under the Ordinance, and thus potentially eligible to continue collective cultivation of medical marijuana as defined by the Ordinance, while those in groups 2 and 3 are not.

Since this is a facial constitutional challenge, the Collectives, as discussed earlier, bear the heavy burden of demonstrating the Ordinance unconstitutional "'in the generality or great majority of cases.' [Citations.]" (*Guardianship of Ann S.*, *supra*, 45 Cal.4th at p. 1126, italics omitted; *Coffman*, *supra*, 176 Cal.App.4th at p. 1145.) This,

21

the Collectives have not done. Based upon *FCC*, *Dukes*, and *Martinet*, *supra*, the exclusion of group 3 by a grandfather provision does not violate equal protection under the rational basis test. Even if we assume for the purpose of argument that unfairness to group 2 somehow implicates equal protection concerns – and we expressly refuse to so find, as discussed above – the Collectives have not demonstrated that this class, or a single collective that would fit within this class, even exists. Approximately 187 medical marijuana entities in existence prior to September 14, 2007, registered under the ICO. Based upon the record before us, we find the existence of group 2, or even a single collective that would fit within group 2, to be no more than a theoretical possibility. Such a theoretical possibility of unconstitutional effect, as discussed earlier, is insufficient to demonstrate an equal protection violation based on a facial challenge. (*Zuckerman*, *supra*, 29 Cal.4th at p. 39; *Arcadia Development, supra*, 197 Cal.App.4th at p. 1535.)

Finally, we address one other issue related to the equal protection challenge. As discussed earlier, the ICO, by its terms, applied to "medical marijuana dispensar[ies]," as defined therein, while the Ordinance, by its terms, applies to "medical marijuana collective[s]," as defined therein. Thus, the ICO required *dispensaries* to register while the Ordinance requires *collectives* to have previously registered under the ICO. In their brief to this court, Melrose et al. argue that this language discrepancy creates an equal protection violation: they contend that the Ordinance is "irrational" because it requires "collectives" to have previously registered under an "expired" ordinance that pertained only to "dispensaries." We reject this contention for the reasons that follow.

First, it appears that no litigant raised this specific argument in the court below and it is therefore waived. (*In re Aaron B.* (1996) 46 Cal.App.4th 843, 846.) We have reviewed the various points and authorities submitted to the trial court on constitutional issues relevant to the request for preliminary injunction and there is no mention, that we could find, of an equal protection violation based on this language discrepancy between the ICO and the Ordinance. That the parties below never raised it is supported by the fact that the trial court never mentions this issue in its opinion. In its opinion, the trial court routinely refers to "collectives" that registered under the ICO and "collectives" that did

22

not.  The trial court does not discuss the incongruous language of the two ordinances or whether that incongruity is material from an equal protection standpoint.

Second, the full extent of this equal protection argument by Melrose et al., insofar as they raise it in their brief to this court, is as described above.  Though Melrose et al. repeat the argument in their brief, they do not expand upon or further analyze it in any material way.  Nor do they support the argument with any specific citations to case authority.  Such an argument, made only in conclusory form, may also be treated as waived.  (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979.)

Third, we find this argument unpersuasive on the merits given the extremely broad definition of "dispensary" contained in the ICO:

> "[Medical marijuana dispensary] means any use, facility or location, including but not limited to a retail store, office building, or structure that distributes, transmits, gives, dispenses, facilitates or otherwise provides marijuana in any manner, in accordance with [s]tate law, in particular, California Health and Safety Code [s]ections 11362.5 through 11362.83, inclusive."

Given the above definition, any collective, as later defined by the Ordinance, in existence at the time of the ICO, would or reasonably should have believed itself to be a "dispensary" subject to the registration requirements of the ICO.  The ICO's definition of "dispensary" is simply too broad to conclude otherwise.  This, of course, is borne out by the significant number of ICO registrants whose names alone either expressly or impliedly suggest collective associations.  Therefore, we find any discrepancy between the two ordinances to be immaterial and thus insufficient to raise equal protection concerns.

Additionally, the trial court, as mentioned above, did not find that any individual litigant, eligible to register under the ICO, chose not to because it did not believe it was a "dispensary" as defined by the ICO.  Further, we have been directed to no evidence in the voluminous record which would support such a finding.  Thus, there is no basis for an as applied challenge on this ground.  And, even if we were to find the discrepancy material in some way – which we expressly do not – the theoretical possibility that a collective

might exist which believed itself not to fit within the ICO's definition of "dispensary" is simply too remote and too hypothetical to support a facial challenge.

Accordingly, we find no violation of equal protection by the Ordinance.

### III. Preemption by State Law*

#### A. The Trial Court's Opinion

The trial court found two portions of the Ordinance to be preempted by the MMPA: (1) section 45.19.6.9, which makes any violation of the Ordinance a misdemeanor and (2) section 45.19.6.10, which "sunsets" the Ordinance two years after its effective date and requires all collectives to cease operation immediately if the Ordinance is not extended. With respect to the Ordinance's criminal enforcement provision, the trial court found the MMPA and the Ordinance contradictory because the MMPA prohibited criminal prosecution for the collective cultivation of medical marijuana while the Ordinance criminalized the same conduct. With respect to the sunset provision, the trial court found the MMPA and the Ordinance contradictory since a ban of all collectives – which would occur if the Ordinance were not extended – would prohibit what the MMPA allowed.

#### B. Applicable Law

Article XI, section 7 of the California Constitution provides that a "county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Otherwise valid local legislation that conflicts with state law is preempted and therefore void. (*Candid Enterprises, Inc. v. Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 885; accord, *Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1242 (*Action Apartment*).) A conflict causing preemption can occur in three different ways: the local

_____

* Reporter's Note: Part III was not ordered published by the Supreme Court; see Reporter's Note, *ante*, page 1.

ordinance (1) duplicates state law; (2) contradicts state law; or (3) enters an area fully occupied by state law.  (*People ex rel. Deukmejian v. County of Mendocino* (1984) 36 Cal.3d 476, 484, overruled on another ground in *Professional Lawn Care Ass'n v.Village of Milford* (6th Cir. 1990) 909 F.2d 929, 933; accord, *Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897 (*Sherwin-Williams*).)

Local legislation is duplicative when it is coextensive with state law.  (*Sherwin-Williams*, *supra*, 4 Cal.4th at p. 897.)  It is contradictory when it is "inimical to or cannot be reconciled with state law."  (*O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061, 1068; accord, *Action Apartment*, *supra*, at p. 1242; *Sherwin-Williams*, *supra*, at p. 898.)

Local legislation enters an area that is "fully occupied" by state law when the Legislature has either (1) *expressly* manifested its intent to fully occupy the area or (2) *impliedly* done so.  (*Sherwin-Williams*, *supra*, 4 Cal.4th at p. 898.)  When evaluating the possibility of *implied* preemption by occupation, courts look at whether one of three possible indicia exists:

> "'(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.'  [Citation.]" (*People ex rel. Deukmejian v. County of Mendocino*, *supra*, 36 Cal.3d at p. 485; accord, *American Financial Services Assn. v. City of Oakland* (2005) 34 Cal.4th 1239, 1252; see also *Sherwin-Williams*, *supra*, 4 Cal.4th at p. 898.)

The party claiming that state law preempts a local ordinance bears the burden of demonstrating preemption.  (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1149.)  Absent a clear indication of legislative intent to preempt, courts presume that local regulation in areas of traditional local concern is not preempted by state law.  (*Ibid.*)  Whether local ordinances are preempted by state statutes is a question of law subject to de novo review.  (*Hill*, *supra*, 192 Cal.App.4th at p. 867.)

25

In its decision, the trial court found that the Ordinance as a whole was not preempted because it entered an area fully occupied – either expressly or impliedly – by the CUA or the MMPA. The trial court did not expressly address whether the Ordinance was duplicative of either the CUA or the MMPA, or whether the Ordinance contradicted the CUA. The trial court's only finding of preemption was that the two specific provisions of the Ordinance mentioned above contradicted the MMPA.

The case law of preemption is, at times, not altogether clear. The parties, in their briefs, each use language from the case law favorable to their respective positions without always clearly articulating which theory of preemption they are defending against or advocating for. This court believes that any resolution of the preemption issues raised in this case should be thoroughly and clearly articulated. Accordingly, we will address preemption by both the CUA and the MMPA under all three theories.

### C. Express or Implied Preemption by Occupation

We agree with the court below that neither the CUA nor the MMPA preempts the Ordinance because the Ordinance enters an area that either expressly or impliedly has been fully occupied by state law. In this regard, it is crucial to remember that the Ordinance, through its various provisions, regulates only "medical marijuana collective[s]," which it defines as associations of four or more qualified patients, persons with identification cards, or primary caregivers, who collectively or cooperatively associate to cultivate medical marijuana as allowed by the CUA and the MMPA. (§ 45.19.6.1(B).) Thus, the Ordinance attempts to regulate neither the individual use or cultivation of medical marijuana nor collective cultivation by less than four persons.

### 1. Occupation Preemption by the CUA

We turn first to the issue of express or implied preemption of the Ordinance by the CUA.

The CUA, by its express terms is a limited statute. It simply gives qualified patients and their primary caregivers only a defense to the state crimes of marijuana possession and cultivation when that possession or cultivation is for medical purposes based upon a physician's written or oral recommendation. (*Ross v. RagingWire*

26

*Telecommunications, Inc.* (2008) 42 Cal.4th 920, 926 (*Ross*); *People v. Mower* (2002) 28 Cal.4th 457, 470-471.) The CUA, notwithstanding the statement in its introductory preamble that its purpose is to ensure that "'seriously ill Californians have the right to obtain and use marijuana for medical purposes,'" does not create a broad right to use marijuana without hindrance or inconvenience. (*Ross*, *supra*, at p. 928, quoting Health & Saf. Code § 11362.5, subd. (b)(1)(A).) The only "right" it creates is the right of a qualified patient or primary caregiver to possess or cultivate medical marijuana without thereby becoming subject to prosecution under Health and Safety Code sections 11357 and 11358. (*Ross*, at p. 929.)

Division Two of this court recently, and succinctly, summarized the extremely limited scope of the CUA:

> "The nature of the right to use marijuana created by the CUA has been examined in several California court decisions. In *People v. Mower* (2002) 28 Cal.4th 457, the California Supreme Court rejected the defendant's argument that the CUA provided an absolute defense to arrest and prosecution for certain marijuana offenses and concluded that the statute provides a limited defense from prosecution for cultivation and possession of marijuana. [Citation.] The defense accorded by the CUA is limited to 'patients and primary caregivers only, to prosecution for only two criminal offenses: [Health and Safety Code] section 11357 (possession) and section 11358 (cultivation).' [Citation.] In view of the statute's narrow reach, 'courts have consistently resisted attempts by advocates of medical marijuana to broaden the scope of these limited specific exceptions.' [Citation.] For example, courts have determined that the CUA did not create 'a constitutional right to obtain marijuana' [citation], and have refused to expand the scope of the CUA to allow the sale or nonprofit distribution of marijuana by medical marijuana cooperatives." (*Kruse*, *supra*, 177 Cal.App.4th at pp. 1170-1171.)

It is clear, then, that the CUA neither expressly nor impliedly seeks to occupy the entire field of medical marijuana use. The CUA consists of a single statutory section, Health and Safety Code section 11362.5, that is only nine paragraphs in length. It provides only a limited defense to two criminal statutes to two types of persons. It does not mention, let alone authorize, medical marijuana collectives or dispensaries. It does not expressly prohibit further legislation in the area of medical marijuana use and, as mentioned earlier, expressly acknowledges the potential validity of other legislation

27

intended to prevent or regulate related conduct that might endanger the general citizenry. (§ 11362.5, subd. (b)(2) ["Nothing in this section shall be construed to supersede legislation prohibiting persons from engaging in conduct that endangers others, nor to condone the diversion of marijuana for nonmedical purposes"].) That the CUA by itself was not intended explicitly or implicitly to occupy fully the entire field of medical marijuana use, but rather contemplated additional future legislation, is fully supported by one of its stated purposes: "[t]o encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana." (§ 11362.5, subd. (b)(1)(C).)

Accordingly, we find no evidence of express or implied preemption by occupation of the Ordinance by the CUA. (See *Kruse*, *supra*, 177 Cal.App.4th at p. 1173 [temporary local moratorium on medical marijuana dispensaries not preempted by CUA]; *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 769 [the CUA did not contemplate the collective cultivation or distribution of medical marijuana].)

### 2. Occupation Preemption by the MMPA

Next, we address express and implied preemption of the Ordinance by the MMPA.

As mentioned above, The MMPA significantly expands the list of offenses to which the defense of medical marijuana use applies, and specifically includes sales of marijuana. (Health & Saf. Code, § 11362.765, subd. (a).) It also significantly expands the categories of persons who can utilize the defense to include not only qualified patients and their primary caregivers, but also holders of identification cards and persons who assist members of these three groups in administering medical marijuana or in acquiring the skills necessary to cultivate or administer medical marijuana. (§ 11362.765, subd. (b).) Most important, for the purpose of this case, the MMPA also immunizes qualified patients, identification card holders, and primary caregivers who associate in order collectively or cooperatively to cultivate marijuana for medical use. (§ 11362.775.)

Nevertheless, in terms of its operative provisions, the MMPA, like the CUA, does not provide blanket immunity from prosecution to qualified patients, identification card holders, and primary caregivers for the enumerated marijuana-related offenses under all

28

circumstances.  Like the CUA, it provides only limited criminal immunity for specified offenses to specific groups of people for specific actions.  (*People v. Mentch* (2008) 45 Cal.4th 274, 290-291; *Kruse*, *supra*, 177 Cal.App.4th at p. 1175.)  These groups of people are immunized from the specified Health and Safety Code violations only if the sole basis of their prosecution is conduct specifically allowed by the MMPA.  (See §§ 11362.765, subd. (a), 11362.775.)  The MMPA does not provide blanket immunity to the specified groups of people under all circumstances.  (See *People v. Mentch*, *supra*, at p. 292; *Hill*, *supra*, 192 Cal.App.4th at p. 869; see also *Kruse*, *supra*, at p. 1175.)

Moreover, the MMPA does not expressly forbid local regulation in the area of medical marijuana use and, in fact, expressly contemplates it.  As mentioned earlier, the MMPA in its original form provided that "[n]othing in this article shall prevent a city or other local governing body from adopting and enforcing laws consistent with this article."  (Stats. 2003, ch. 875, § 2 [Health & Saf. Code, former § 11362.83].)  If there remained any doubt that the MMPA contemplated local regulation of conduct related to medical marijuana use, its amendment during the pendency of this appeal completely refutes it:  the MMPA now expressly allows for "civil and criminal enforcement" of local ordinances "that regulate the location, operation, or establishment of a medical marijuana cooperative or collective."  (§ 11362.83, subd. (b).)  In other words, the MMPA, as amended, not only fails to ban local regulation (including criminal enforcement),it now affirmatively and expressly allows for it.  This fact is significant in terms of our preemption decision since "[p]reemption by implication of legislative intent may not be found when the Legislature has expressed its intent to permit local regulations."  (*People ex rel. Deukmejian v. County of Mendocino*, *supra*, 36 Cal.3d at p. 485.)

We believe that this change to the MMPA, though it postdates both the Ordinance and the trial court's enjoining of it, remains relevant to our decision.  Prior to the amendment of Health and Safety Code section 11362.83, the issue of regulating medical marijuana collectives or dispensaries through local civil and criminal ordinances had been raised in various appellate decisions.  (E.g., *Hill*, *supra*, 192 Cal.App.4th at pp. 866-870; *Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 754;

*Kruse, supra*, 177 Cal.App.4th at pp. 1167-1177; *City of Corona v. Naulls*, *supra*, 166 Cal.App.4th at p. 425.)  When enacting new legislation or amendments to existing statutes, the Legislature is presumed to be aware of relevant appellate court decisions. (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1155 (*Harris*), superseded by statute on another ground as stated in *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 672.)  The amendment to section 11362.83 expressly allowing local civil and criminal enforcement is completely consistent with the broad language of section 11362.83 as originally enacted and occurred after the decisions referenced above.  We find, therefore, that the amendment was the Legislature's response to these decisions, the purpose of which was to expressly clarify what the statute had always implicitly allowed. (See *Harris*, at p. 1156 ["In the area of statutory construction, an examination of what the Legislature has done (as opposed to what it has left undone) is generally the more fruitful inquiry"]; *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 735 [adding statutory language which is consistent with earlier case law construing the statute amounts to "legislative endorsement" of that construction].)

Under these circumstances, it is clear that the MMPA does not expressly or impliedly preempt the Ordinance by occupying the entire field of medical marijuana use. (See *Hill*, *supra*, 192 Cal.App.4th at p. 868 [county requirements of business license, approved conditional use permit, and 1,000 foot distance from libraries and schools for marijuana dispensaries not preempted by MMPA]; *Kruse*, *supra*, 177 Cal.App.4th at pp. 1175-1176 [temporary local moratorium on marijuana dispensaries not preempted by MMPA].)

### D. Preemption by Duplication

The Ordinance's requirements apply only to medical marijuana collectives of four or more persons.  The CUA does not regulate or even mention medical marijuana collectives.  A portion of the MMPA does provide limited criminal immunity to qualified patients, identification card holders, and primary caregivers who collectively cultivate marijuana, but the MMPA does not specifically define what a collective is.  (See Health & Saf. Code, § 11362.775.)  Read as a whole, it also addresses additional medical

30

marijuana issues unrelated to collective cultivation. The Ordinance, therefore, is not coextensive with either the CUA or the MMPA. Accordingly, it is not preempted by duplication. (See *Sherwin-Williams*, *supra*, 4 Cal.4th at p. 897.)

### E. Preemption by Contradiction

We next discuss preemption by contradiction.

#### 1. Contradiction of the CUA

Since the CUA does not mention, let alone regulate medical marijuana collectives, and since the requirements of the Ordinance apply only to medical marijuana collectives as defined therein, the Ordinance does not contradict the CUA.

#### 2. Contradiction of the MMPA

The trial court found the criminal enforcement provisions of the Ordinance preempted because the MMPA prohibits criminal sanctions for the collective cultivation of medical marijuana while the Ordinance criminally punishes that very conduct. Similarly, the trial court found the sunset provision of the Ordinance preempted since – were the Ordinance to sunset – it would result in a ban of medical marijuana collectives, entities expressly allowed by the MMPA. Based upon our de novo review, we conclude that the trial court erred in these findings.

When deciding whether the MMPA preempts these portions of the Ordinance by contradiction, we employ standard rules of statutory construction. The fundamental task of statutory construction is to ascertain legislative intent so as to effectuate the purpose of the law. (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977.) When construing statutes, we look first to the words of the statute, which should be given their usual, ordinary, and common-sense meaning. (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519.) Where the language of a statute is clear and unambiguous, we go no further. (*Ibid.*) Only if the statutory language is ambiguous do we consult "extrinsic aids," such as the objects to be achieved by the statute, its legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which it is a part. (*Ibid.*; see *Wilcox v. Birtwhistle*, *supra*, at p. 977.)

31

### a.  The Criminal Enforcement Provisions

We first address preemption of the criminal enforcement provisions.  Again, the MMPA in its original form expressly provided that "[n]othing in this article shall prevent a city or other local governing body from adopting and enforcing laws consistent with this article."  (Stats. 2003, ch. 875, § 2 [Health & Saf. Code, former § 11362.83].)  Again, this language is certainly broad enough to include local criminal laws consistent with the MMPA.  Furthermore, its 2012 amendment expressly allows both (1) local ordinances that regulate "the location, operation, or establishment" of medical marijuana collectives and (2) *criminal* enforcement of those ordinances.  (§ 11362.83, subds. (a) & (b).)  As discussed earlier, this further corroborates that the MMPA, even in its original form, contemplates and allows for criminal enforcement of local regulations.  (See *Harris*, *supra*, 52 Cal.3d at p. 1156.)

Additionally, effective January 1, 2011, the Legislature added Health and Safety Code section 11362.768 to the statutory provisions containing the MMPA.  Subdivision (b) of this section prohibits a "medical marijuana cooperative, collective, dispensary, operator, establishment, or provider who possesses, cultivates, or distributes medical marijuana" from locating within 600 feet of a school.  Significantly, subdivision (f) of this section further reinforces the legitimacy of local regulation by also providing that "[n]othing in this section shall prohibit a city, county, or city and county from adopting ordinances or policies that further restrict the location or establishment of a medical marijuana cooperative, collective, dispensary, operator, establishment, or provider."

It is against this backdrop that the alleged preemption of the Ordinance's specific criminal sanctions must be examined.  The Ordinance criminalizes as a misdemeanor any violation of its provisions, most of which deal with the location or operation of collectives.  For example, collectives must do all of the following:  (1) maintain certain distances from each other and certain public, religious, and other buildings; (2) secure windows, roof hatches, and doors in a specified fashion; (3) maintain specific signage and illuminate it in a specific way; (4) maintain specifically described closed circuit

32

television monitoring and fire/burglar alarm systems; (5) provide state licensed security guards; (6) operate only during hours specified by the Ordinance; (7) periodically test marijuana for purity and then post the results in a specific fashion; (8) submit to annual City audits; and (9) keep certain records related to their members and make these records available to the City police. (§§ 45.19.6.3-45.19.6.5.) The Ordinance, of course, also limits the total number of collectives which may operate within the City and limits the number which may operate within any specific City district. (§ 45.19.6.2 (B)(1).)

These criminal sanctions – as well as others contained in the MMPA but not particularly described herein – do not contradict and thus are not preempted by the MMPA. The MMPA – implicitly in its original form and expressly as amended in 2012 – permits local criminal ordinances that regulate medical marijuana collectives. Most important, when amending the MMPA in 2011 and 2012, the Legislature chose to allow local regulation of not only the location or operation of collectives, but also the *establishment* of collectives. Webster's defines "establishment" as "the act of establishing something or the state of being established: as . . . the act of bringing into existence, creating, founding, originating, or setting up so that a certain continuance is assured." (Webster's 3d New International Dictionary (2002) p. 778.) The Legislature's specific inclusion of "establishment" in both the amendment to Health and Safety Code section 11362.83 and new section 11362.768 is not insignificant: the plain meaning of "establishment" clearly expresses the Legislature's intent to allow not only local regulation of the geographic placement of collectives and the manner in which they conduct operations, but also local regulation of the *creation* of collectives. The local power to regulate creation, by definition, carries with it the power to regulate the number of collectives in existence. We think it clear, based upon the sections described above, that the Legislature expressly allowed for (1) local regulation of the location, operation, and existence of collectives and (2) criminal sanctions for violation of such regulations. The enforcement provisions of the Ordinance are consistent with this local authority granted by the MMPA.

Contrary to the trial court's conclusion, the Ordinance does not punish the collective cultivation of medical marijuana. Simply put, the Ordinance punishes violations of local law that regulate collective cultivation, laws that were always implicitly and are now expressly permitted by the MMPA. The Ordinance does not purport to prohibit or in any way restrict the availability of the limited defense created by the MMPA to prosecutions against qualified patients, identification card holders, primary caregivers, and members of those groups who collectively cultivate medical marijuana, for the enumerated Health and Safety Code sections. And, finally, the Ordinance's criminal sanctions are potentially applicable only to collectives of four or more persons. By its own terms, the Ordinance's sanctions are completely inapplicable to collectives of three or less. Under these circumstances, it cannot be said that the Ordinance's criminal sanctions are "inimical to" and therefore in contradiction with the MMPA. We find no preemption of the Ordinance's criminal enforcement provisions by the MMPA.

### b. The Sunset Clause

Next, we turn to the Ordinance's sunset clause.

The City first argues that because the sunset clause has not yet taken effect and may not take effect, the issue of preemption of this provision is not ripe for decision. Ordinarily we would agree with this position. The timing of this decision, however, compels us to reach the issue in order to avoid additional litigation and expenditure of judicial resources. Currently, the TCO abrogates the sunset provision, which would have gone into effect June 6, 2012. Since we reverse the trial court's decision, however, the TCO, by its terms, is essentially repealed and the Ordinance, in its original form, is again effective. This means the sunset provision will be triggered upon this decision becoming final. In light of this, we think it appropriate to reach a decision on the merits of the sunset clause so that all parties know where they stand going forward.

The trial court found that the "blanket ban on all collectives" that would be caused if the sunset clause were triggered would "prohibit what the statute commands" and thus contradict the MMPA. First of all, this misconstrues the Ordinance's sunset clause. Triggering of the sunset clause does not create a blanket prohibition of all collectives, but

34

only of those collectives comprised of four or more qualified persons. Collectives comprised of three or less persons could continue to operate since they are outside the scope of the Ordinance.[10] This case does not involve, and we express no opinion regarding the legality of, a local ban of all medical marijuana collectives.

Further, the trial court's ruling misconstrues what the MMPA, by its express terms, actually does. The MMPA does not differ in kind from the CUA. As stated earlier, although it further implements and expands upon the CUA, it is still only a statute that provides limited criminal immunities to specific groups of people under a narrow set of circumstances. (See *People v. Mentch*, *supra*, 45 Cal.4th at p. 290; *Kruse*, *supra*, 177 Cal.App.4th at p. 1175.) Nowhere does the language of its operative terms command or even affirmatively allow the existence of collectives or dispensaries. Its operative terms do not affirmatively create any right, constitutional or otherwise, to cultivate or distribute medical marijuana through collectives or dispensaries. The MMPA does not preclude local action except in the area "of according qualified persons affirmative defenses to enumerated penal sanctions." (*Kruse*, *supra*, at p. 1176.) The MMPA simply does not prohibit a sunset clause of the type contained in the Ordinance. To the contrary, it actually contemplates such a clause since its express language affirmatively permits local regulation of the *establishment* – meaning existence – of marijuana collectives. (Health & Saf. Code, §§ 11362.768, subd. (f), 11362.83, subds. (a) & (b).)

---

**10**       During oral argument, the City contended that a triggering of the sunset clause would essentially repeal the Ordinance and leave no portion of it in place. In terms of regulating medical marijuana collectives, the City would essentially be left with only its general zoning laws and laws governing nonconforming uses and variances. We disagree with this interpretation of the sunset clause. The sunset clause does not simply state that the Ordinance shall sunset after two years if not extended. It states that the Ordinance "shall sunset two years after the effective date . . . *and all collectives shall cease operation immediately*, unless the City Council adopts an ordinance to extend these provisions." (§ 45.19.6.10, italics added.) Thus, the operative provision is not simply a sunset clause, but a sunset clause *plus* a prohibition of all collectives, as defined in the Ordinance. Thus, a common-sense reading of the sunset clause means that, if triggered, it would require all collectives of four or more qualified persons to cease operation.

*Nordyke v. King* (2002) 27 Cal.4th 875, 883-884 (*Nordyke*), is instructive in this regard. In *Nordyke*, Alameda County enacted an ordinance which banned the possession of firearms on county property. (*Id*. at pp. 880-881.) One of the primary consequences of the ordinance was the effective prohibition of gun trade shows on county property. (*Id*. at p. 881.) Plaintiffs, who were gun show promoters, sought to enjoin the ordinance, relying in part on Penal Code section 171b. (*Nordyke*, at p. 883.) Subject to certain exceptions, section 171b, subdivision (a), generally prohibits possession of firearms in state or local public buildings. Section 171b, subdivision (b)(7), exempts from the prohibition persons bringing firearms for lawful sale or trade into a gun show otherwise lawful under state law. (*Nordyke*, at p. 883.) Plaintiffs argued that subdivision (b)(7) preempted the county from outlawing guns at public buildings being used for an otherwise lawful gun show. (*Nordyke*, at p. 884.) The Supreme Court responded in no uncertain terms:

> "We disagree. The provision [section 171b, subdivision (b)(7)] merely exempts gun shows from the state criminal prohibition on possessing guns in public buildings, thereby permitting local government entities to authorize such shows. It does not *mandate* that local government entities permit such a use, and the Nordykes cite no legislative history indicating otherwise." (*Nordyke*, *supra,* 27 Cal.4th at p. 884.)

In the immediate case, similarly, the MMPA simply exempts certain persons from prosecution for certain state offenses based solely on the collective cultivation of medical marijuana. It does not affirmatively mandate that any local government allow or authorize such an activity.[11]

---

[11]     420 Caregivers et al. cite *Fiscal v. City and County of San Francisco* (2008) 158 Cal.App.4th 895 (*Fiscal*), wherein the court found a local gun ban preempted by Penal Code section 12026. We find *Fiscal* distinguishable from the immediate case. Section 12026, as construed by the precedent recited in *Fiscal*, affirmatively provides that no permit or license, state or local, can be required before a citizen can possess a gun in his residence. (*Fiscal,* at p. 908.) In its finding of preemption, the *Fiscal* court concluded that it "'strains reason to suggest that the state Legislature would prohibit [local] licenses and permits but allow a [local] ban on possession.' [Citation.]" (*Ibid.*) In the instant case, there is no such affirmative restriction on local authority to

Moreover, there is no need to examine the legislative history of the MMPA, as suggested by *Nordyke*, because the language of the MMPA is clear.  (*Hoechst Celanese Corp. v. Franchise Tax Bd.*, *supra*, 25 Cal.4th at p. 519.)  The MMPA may have expanded the offenses to which an affirmative defense may be raised and it may have expanded that defense to encompass collective conduct, but it does not, by its clear language, do anything more.  And it is inappropriate for the judiciary, no matter how desirable it may be from a policy perspective, to accomplish through "the guise of liberal interpretation" what is outside the express terms of the statute.  (*Simpson v. Unemployment Ins. Comp. Appeals Bd.* (1986) 187 Cal.App.3d 342, 351.)  We thus find no preemption of the Ordinance's sunset clause by the MMPA.

[*Reporter's Note:  End of part not ordered published by Supreme Court; see Reporter's Note, page 1.*]

## IV.  Due Process

### A.  The Trial Court's Opinion

Section 45.19.6.7 provides that any existing collective not in compliance with the requirements of the Ordinance must cease operation until such time, if any, that it comes into compliance.  On May 4, 2010, the City sent letters to collectives that had not registered under the ICO and who were therefore ineligible to register under the Ordinance.  The letters advised these collectives of the Ordinance's June 7, 2010 effective date, that they could not comply with the Ordinance, and, therefore, that they must cease operation immediately.  The letter also advised the collectives that continued operation might subject them to criminal misdemeanor penalties, civil penalties, injunctive relief, or revocation of any certificate of occupancy.  In its opening paragraph, the letter characterized itself as a "courtesy notice" while the concluding sentence advised the collective to consult its attorney if it had any questions about the Ordinance.

---

regulate collectives; in fact, as discussed above, the MMPA expressly allows local regulation, both civil and criminal, of medical marijuana collectives.

The trial court found that the MMPA creates a statutory right to cultivate marijuana collectively for medical purposes.  It further found that section 45.19.6.7, in conjunction with the May 4 letter, abrogates that right without a hearing or any other procedural protections.  For that reason, the trial court concluded, the Ordinance violates procedural due process as required by the California Constitution.

## B.  Applicable Law

Procedural due process, as required by the United States Constitution, protects only those matters which may be construed as liberty or property interests.  (*Matthews v. Eldridge* (1976) 424 U.S. 319, 332; *Board of Regents v. Roth* (1972) 408 U.S. 564, 569; *Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1059.)  Due process, as required by the California Constitution, is more expansive: its protections extend potentially to any statutorily conferred benefit, whether or not it can be properly construed as a liberty or property interest.  (*People v. Ramirez* (1979) 25 Cal.3d 260, 263-264.)  When an individual is deprived of such a benefit, due process analysis under California law focuses not on the precise characterization of the benefit but simply on what process is constitutionally required given the governmental and private interests at issue.  (*Ibid.*; *Ryan*, *supra*, at p. 1069.)  California due process protections derive primarily from the individual's right to be free from arbitrary adjudicative procedures in and of themselves, regardless of the precise nature of the interest at stake.  (See *Ramirez*, *supra*, at p. 267; *Ryan*, *supra*, at p. 1070.)  Thus, when conducting this weighing of private and governmental interests to determine what process is due, courts should focus on procedural protections designed to promote accurate and reliable administrative decisions.  (*Ramirez*, *supra*, at p. 267; *Ryan*, *supra*, at pp. 1069-1070.)

## C.  Legal Analysis

As the above cases make clear, California due process protection, although more expansive than its federal counterpart, still requires the existence of some statutory benefit or entitlement before it is triggered.  We find no such benefit or entitlement in this case which is in any way affected by the Ordinance.  As discussed above, the MMPA

does not create a right collectively to cultivate medical marijuana. Although the CUA seems to encourage the Legislature to create such a right (Health & Saf. Code, § 11362.5, subd. (b)(1)(C)), it chose not to when enacting the MMPA and instead simply expanded the immunities initially created by the CUA to include additional state offenses and additional conduct that is collective or cooperative in nature. The MMPA creates no right or benefit, other than the right of certain specified persons to be free from prosecution for certain specified state offenses based upon certain specified conduct. The Ordinance in no way affects the availability of this limited immunity and thus does not abrogate any right or benefit created by the MMPA.

Furthermore, even if the MMPA could be construed to create some type of benefit or right affected by section 45.19.6.7, there is no deprivation without due process. First, insofar as the trial court relied upon the May 4 letter as a basis for its due process ruling, that letter was sent only as a "courtesy," expressly advises collectives to consult with their attorneys and, most importantly, is not a part of or even authorized by the Ordinance. The *letter*, since not part of the statute's enforcement scheme, cannot serve as a basis for a ruling that the *Ordinance* violates California due process. It is nothing more than an advisory letter, which states the opinion of the City's chief prosecutor that the collective is or will be in violation of the Ordinance. It does not, and cannot, by itself enforce the Ordinance.

Additionally, section 45.19.6.7 does not, by any of its terms, create some type of summary or constitutionally deficient procedure for its enforcement. Like the balance of the Ordinance, section 45.19.6.7 relies instead on section 45.19.6.9 for enforcement. Section 45.19.6.9 provides:

> "Each and every violation of this article shall constitute a separate violation and shall be subject to all remedies and enforcement measures authorized by [s]ection 11.00 of this [c]ode. Additionally, as a nuisance per se, any violation of this article shall be subject to injunctive relief, revocation of the collective's registration, revocation of the certificate of occupancy for the location, disgorgement and payment to the City of any and all monies unlawfully obtained, costs of abatement, costs of investigation, attorney fees, and any other relief or remedy available at law or equity. The City may also pursue any and all remedies and actions

39

available and applicable under local and state laws for any violations committed by the collective and persons related or associated with the collective."

Section 11.00 makes violations of the Los Angeles Municipal Code continuing violations, subject to (1) punishment as misdemeanors or (2) civil penalties to a maximum of $2,500. (§ 11.00, subds. (*l*) & (m).) It also makes violations public nuisances subject to abatement by temporary restraining order, injunction, or any other order "issued by a court of competent jurisdiction." (§ 11.00, subd. (*l*).)

As section 45.19.6.9 and section 11.00 make clear, section 45.19.6.7, like the balance of the Ordinance's provisions, is enforceable by the City only if the City commences formal legal proceedings – misdemeanor criminal prosecutions, nuisance actions, or civil suits – subject to all the procedural protections that full adversarial hearings provide. Section 45.19.6.7 does not provide for its own summary administrative enforcement apart from ordinary lawsuits or criminal prosecutions and thus does not implicate due process concerns.

In this regard, *Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976 (*Lusardi*), is instructive. In *Lusardi*, a private construction company (Lusardi) entered into a construction project with a public hospital district based upon the representation that the project was not a public work project for purposes of the prevailing wage law. (*Id.* at p. 983.) Midway through the project, the Director of the state Department of Industrial Relations (Director) determined that the project was in fact a public work project and requested Lusardi's payroll records, presumably to ensure compliance with the prevailing wage law. (*Id.* at pp. 983-984.) A branch of the Department of Industrial Relations, the Division of Apprentice Standards, also requested records to ensure compliance with statutory apprenticeship requirements. (*Id.* at p. 984.) Both agencies threatened penalties if Lusardi did not comply. (*Ibid.*) Rather than comply, Lusardi ceased all work on the project and filed a lawsuit. (*Ibid.*) In its action, Lusardi argued, in part, that the Director's administrative decision to classify the construction as a public work project violated due process. (*Id.* at p. 990.)

40

The Supreme Court disagreed. The Court observed that under the applicable statutory scheme, the Director had no authority to adjudicate formally whether a project is or is not a public work or, therefore, whether a contractor has or has not underpaid workers in violation of the prevailing wage law. (*Lusardi, supra,* 1 Cal.4th at p. 990.) The Director had only the authority to file a legal action alleging those facts so that a court could reach the ultimate decision. (*Ibid*.) The Court characterized the Director's authority as "purely prosecutorial." (*Ibid*.) It further observed:

> "Thus, what the Director and his designees did in this case was to notify the [hospital] District and Lusardi that, in view of the authorities, the project was a public work and the prevailing wage law applied. There is no statute requiring the Director to so notify an awarding body or contractor; apparently the Director did so in the hope that voluntary compliance could avoid the necessity to bring an action under [the prevailing wage law]. But before the Director could bring a court action under [the prevailing wage law], Lusardi sued the Director, claiming its due process rights were violated." (*Lusardi, supra,* 1 Cal.4th at p. 991.)

After a review of the relevant case law, the Court further concluded that the Director's initial determination did not violate due process: "Thus, the case law establishes that persons against whom criminal or civil charges may be filed has no procedural due process right to notice and a hearing until and unless an executive branch official actually files formal civil or criminal charges." (*Lusardi, supra,* 1 Cal.4th at p. 992.) As if to remove any doubt, the Court finally stated:

> "The Director's decision that a project is a public work may lead to further action that triggers due process rights. Should the [Department of Industrial Relations] seek to recover underpayments of the prevailing wage from Lusardi in a court action under the [prevailing wage law], Lusardi will be entitled to fully litigate the issue of its liability in the trial court. But at the time the Director's preliminary determination is made, no process is due." (*Lusardi*, *supra*, 1 Cal.4th at p. 993.)

From our perspective, there is no principled way to distinguish *Lusardi* from the immediate case. The May 4 letter, in our opinion, is nothing more than notification to the collectives involved that the City Attorney believed the collectives were or shortly would be in violation of the Ordinance. By itself, such a letter cannot enforce the Ordinance or deprive any collective of any statutory benefit. To enforce the Ordinance, the City is

41

required to file either a civil or criminal lawsuit which, of course, will trigger the full adversarial protections provided any litigant in any court action.

Thus, we find no due process violation by the Ordinance.

## V.  The Right to Privacy

### A.  The Trial Court's Opinion

Section 45.19.6.4 of the Ordinance describes the record-keeping obligations of City-permitted collectives.  It requires collectives to maintain, for a period of five years, various records, including the "full name, address and telephone number(s) of all patient members to whom the collective provides medical marijuana, a copy of a government-issued identification card for all patient members, and a copy of every attending physician's or doctor's recommendation or patient identification card[.]"  It additionally requires that all records, including the ones described particularly above, be made available by the collective to the Los Angeles Police Department "upon request."  As mentioned earlier, however, section 45.19.6.4 also specifically exempts from this disclosure requirement "private medical records" of collective members.  The police can demand such records only pursuant to an otherwise lawful search warrant, subpoena, or court order.

The trial court found that by allowing the police to obtain the general contact information of collective members (name, address, and telephone number) upon request and without any additional procedural safeguards, the Ordinance violates the state constitutional right to privacy.[12]

---

[12]     The Collectives raised a number of other privacy arguments with respect to other provisions of the Ordinance in the court below, all of which were rejected or found to be moot by the trial court.  The Collectives failed to perfect their own appeal regarding these issues.  We therefore have no jurisdiction to consider these additional privacy issues.  (*In re Marriage of Weiss* (1996) 42 Cal.App.4th 106, 119.)

### B. Applicable Law

Article I, section 1 of the California Constitution guarantees, among, other things, a right to privacy:

> "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

There are three elements of a privacy violation which a plaintiff must demonstrate: (1) the existence of a legally protected privacy interest; (2) a reasonable expectation of privacy under the circumstances; and (3) a serious invasion of that privacy interest. (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 39-40 (*Hill v. NCAA*).) A defendant may prevail by negating any one of the above three elements or by asserting the affirmative defense that any invasion of privacy was justified by one or more legitimate but competing interests. (*Id.* at p. 40.) A plaintiff may rebut the showing of a competing interest by demonstrating the availability of feasible alternatives with a lesser impact on the privacy interest. (*Ibid*.)

In terms of the first element, legally protected privacy interests are generally of two categories: (1) interests in preventing the disclosure or misuse of sensitive information (informational privacy) and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference (autonomy privacy). (*Hill v. NCAA, supra*, 7 Cal.4th at p. 35.) Informational privacy is the core value furthered by the Constitution's privacy clause. (*White v. Davis* (1975) 13 Cal.3d 757, 774; accord, *Hill v. NCAA*, at p. 35.) Privacy interests are not absolute and must be assessed separately and in context. (*Hill v. NCAA, supra*, at p. 35.) The immediate case involves only the issue of informational privacy.[13]

With respect to the second element, the extent of a privacy interest is not independent of circumstances. (*Hill v. NCAA, supra,* 7 Cal.4th at p. 36.) Even when a

---

[13] Respondents raised the issue of autonomy privacy below, but the trial court rejected it. Because it has not been affirmatively raised on appeal, it is waived. (See fn. 12, *ante*.)

legally cognizable privacy interest exists, circumstances may be present which affect whether an expectation of privacy remains reasonable. (*Ibid.*) Customs, practices, and physical settings surrounding particular activities may create or inhibit reasonable expectations of privacy. (*Ibid.*) "A 'reasonable' expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms." (*Id.* at p. 37.)

Because complete privacy does not exist in the modern world, actionable invasions of privacy, the third element of a privacy violation, "must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of social norms underlying the privacy right." (*Hill v. NCAA, supra,* 7 Cal.4th at p. 37.) The extent and gravity of the invasion is therefore indispensable when evaluating an alleged invasion of privacy. (*Ibid.*)

Insofar as defenses are concerned, invasion of a privacy interest is not a constitutional violation if justified by a legitimate competing interest. (*Hill v. NCAA, supra,* 7 Cal.4th p. 38.) "Legitimate interests derive from the legally authorized and socially beneficial activities of government and private entities." (*Ibid.*) Conduct which allegedly violates the right to privacy must be evaluated based upon the extent to which it furthers a legitimate and important competing interest. (*Ibid.*)

Whether a legally recognized privacy interest exists is a question of law subject to de novo review. (See *Hill v. NCAA, supra,* 7 Cal.4th at p. 40.) Whether the plaintiff has a reasonable expectation of privacy under the circumstances and whether a defendant's conduct is a sufficiently serious invasion of the right to find a violation are mixed questions of law and fact. (*Ibid.*) If undisputed material facts show no reasonable expectation of privacy or only an insubstantial impact on privacy interests, these issues may also be decided as questions of law. (*Ibid.*)

### C.  Legal Analysis

This case raises the issue of *who* is asserting the privacy rights of *whom*: (1) whether collectives are asserting their own privacy rights; (2) whether collectives are asserting the privacy rights of their individual, human, members; or (3) whether

individual members are asserting their own privacy rights. While it is beyond dispute that article I, section 1 of the California Constitution protects the privacy of *people*, it is not entirely clear to what extent legal entities *other than people* (1) may assert their own privacy rights based upon this provision or upon other sources or (2) may have standing to assert the privacy rights of people who are their members or with whom they are otherwise involved. (See, e.g., *Connecticut Indemnity Co. v. Superior Court* (2000) 23 Cal.4th 807, 817 [Court assumes but does not decide that corporate *insureds* have privacy rights which may be asserted by their corporate *insurer*]; *Roberts v. Gulf Oil Corp.* (1983) 147 Cal.App.3d 770, 797 [although corporation not protected by article I, section 1 of the state Constitution, it may still have limited right to privacy dependent upon its "nexus" with human beings and "the context in which the controversy arises"]; see also *Hecht, Solberg, Robinson, Goldberg & Bagley LLP v. Superior Court* (2006) 137 Cal.App.4th 579, 594 [same holding as *Roberts*]; *Ameri-Medical Corp. v. Workers' Comp. Appeals Bd.* (1996) 42 Cal.App.4th 1260, 1287-1288 [same holding as *Roberts*].)

We need not decide these broad issues of entity privacy or the extent to which collective or cooperative entities may assert the privacy rights of their human members. We assume, without deciding, that both the collective and individual respondents in this case have certain privacy expectations in the records subject to disclosure under the Ordinance. Notwithstanding this assumption, the Ordinance does not violate any right to privacy. To the extent the respondents *as collectives* are asserting their own privacy rights, we find no issue with either the record-keeping or disclosure requirements of the Ordinance given the heavily regulated area in which the collectives operate. Whether analyzed as creating an unreasonable expectation of privacy or an invasion of a reasonable expectation of privacy justified by a legitimate competing state interest, such entities are subject to greater privacy intrusions than would be allowed in the context of individuals or more ordinary businesses. Insofar as collectives are asserting the privacy rights of their *individual* members or, in the case of the Anderson et al. respondents, asserting their own *individual* privacy rights, we also find no invasion of privacy, based largely on similar analysis. Further, because the material facts are not in dispute, we

45

address these issues essentially as questions of law subject to de novo review. (See *Hill v. NCAA*, *supra*, 7 Cal.4th at p. 40.)

Both the federal and state courts have long recognized that "closely regulated" businesses have a reduced expectation of privacy that relaxes the probable cause and warrant requirements ordinarily required for law enforcement searches. (E.g., *New York v. Burger* (1987) 482 U.S. 691, 702 [automotive wrecking yards]; *Whalen v. Roe* (1977) 429 U.S. 589, 602 [pharmacies]; *People v. Doss* (1992) 4 Cal.App.4th 1585, 1598 [pharmacies]; *People v. Paulson* (1990) 216 Cal.App.3d 1480, 1484 [saloons]; *Fendrich v. Van de Kamp* (1986) 182 Cal.App.3d 246, 260 [gambling establishments]; *Kim v. Dolch* (1985) 173 Cal.App.3d 736, 743 [massage parlors]; *People v. Harbor Hut Restaurant* (1983) 147 Cal.App.3d 1151, 1156 [wholesale fish industry].) This is so, at least in part, because of the strong government interest in regulating such businesses or industries. (See *New York v. Burger*, *supra*, at p. 700.)

Ordinary pharmacies dispensing traditional prescription drugs are closely regulated businesses. (*People v. Doss, supra*, 4 Cal.App.4th at p. 1598.) Consequently, they are required to maintain records of the type described by the Ordinance and present them to "authorized officers of the law" without a warrant. (*Ibid.*; see also Bus. & Prof. Code, §§ 4081, subd. (a), 4333, subd. (a).) We see no reason to accord marijuana collectives greater privacy with respect to the information at issue here. Marijuana collectives are engaged in the distribution of a substance, illegal under state law except as a basis for the prosecution of specified offenses under the specified conditions set forth in the CUA and the MMPA. Furthermore, marijuana is a Schedule I controlled substance still *entirely illegal* under federal law. (*Ross, supra,* 42 Cal.4th at p. 926; see also *Gonzales v. Raich* (2005) 545 U.S. 1, 14-15, 25-27.)

The record below supports a finding that a number of so-called medical marijuana collectives are collectives in name only: rather than distribute marijuana to collective members for medical purposes, they instead sell marijuana to third parties for profit. The record also shows that the Los Angeles Police Department is forced to expend scarce resources to combat this criminal activity. Under these circumstances, it would be

entirely irrational to accord marijuana collectives – as entities – greater privacy rights than pharmacies involved in the distribution and use of traditional prescription drugs. We find that any expectation of privacy by a collective in the limited, and nonintimate, information sought by the Ordinance to be unreasonable. Alternatively, and based on the same facts described above, we find any invasion of a reasonable expectation of privacy to be justified by a legitimate and competing state interest.

For similar reasons, we reach the same result with respect to any assertion of privacy rights by individual collective members or by collectives on behalf of their individual members. First, the information sought is extremely limited and nonintimate in nature: the name, address, and phone number of any given collective member. A member's medical records – which would contain significantly more personal and intimate information – cannot be obtained without a lawful warrant, subpoena, or court order.

Furthermore, statutes already allow the disclosure of patient contact information by traditional health care providers upon demand. Absent a formal written request by a patient to the contrary, ordinary health care providers may already release, upon request, contact information *and* a description of the reason for treatment, the general nature of the condition requiring treatment, and the general condition of the patient. (Civ. Code, § 56.16; see *Garrett v. Young* (2003) 109 Cal.App.4th 1393, 1406.) Pharmacies are already required to make patient prescriptions – which themselves must contain patient contact information – available for inspection by "authorized officers of the law." (Bus. & Prof. Code, §§ 4040, subd. (a)(1), 4333, subd. (a).) Insofar as Schedules II, III, and IV controlled substances (drugs which may be *legally* prescribed) are concerned, pharmacies are already required weekly to provide the state Department of Justice with the names, addresses, and phone numbers of prescribed users. (Health & Saf. Code, § 11165, subd. (d)(1).) This information, in turn, may be given to state, local, or federal agencies for purposes of criminal or disciplinary investigations. (Health & Saf. Code, § 11165, subd. (c).)

In short, even where the privacy rights of individual collective members are concerned, the information sought is extremely limited and nonintimate in nature and the information – plus more – is typically already subject to disclosure in the context of more traditional health care treatments and providers. Again, for the same reasons as discussed above in connection with the rights of collectives as entities, we see no reason to give medical marijuana users greater privacy rights than patients utilizing more traditional health care providers and more traditional prescription drugs. Indeed, given the continued illegal nature of marijuana under most circumstances, even more substantial invasions of privacy would likely be justified under the current state of the law. Whether analyzed as an unreasonable expectation of privacy or a reasonably justified invasion of a reasonable expectation of privacy, we find no violation of the collectives' members' individual privacy rights.

In its order, the trial court relied on *Board of Medical Quality Assurance v. Gherardini* (1979) 93 Cal.App.3d 669, while Melrose et al., in their brief to this court, rely heavily on *Bearman v. Superior Court* (2004) 117 Cal.App.4th 463. We find neither case controlling in the immediate circumstances. Both cases dealt with the release of patients' actual medical records, not just contact information. (*Gherardini*, *supra*, at p. 673; *Bearman*, *supra*, at p. 466.) That situation is not presented by the immediate case.

## DISPOSITION

Based upon our resolution of the various questions presented by this appeal, respondents have not demonstrated a likelihood of prevailing on the merits at trial. The trial court's order granting the request for a preliminary injunction is therefore reversed. The case is remanded for further proceedings consistent with this opinion.

Appellant is awarded costs on appeal.

SORTINO, J.[*]

We concur:   BIGELOW, P. J.

RUBIN, J.

---

[*]   Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

48